HOWARD HARDY & CO., INC. *v.* UNITED STATES (No. 4041) [1]

United States Court of Customs and Patent Appeals, May 3, 1937

*H. George Rediker* for appellant.

*Joseph R. Jackson*, Assistant Attorney General (*Charles D. Lawrence*, Special Assistant to the Attorney General, and *Marcus Higginbotham, Jr.*, special attorney, of counsel), for the United States.

[1] T. D. 48978.

[Oral argument April 6, 1937, by Mr. Rediker and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Appellant imported from England and exported to England 133 pieces of woolen piece goods and claimed drawback under and by virtue of the provisions of section 313, Tariff Act of 1930, for the reason that prior to exportation of the merchandise the same had gone through a process known as "Imperial finishing."

The Collector of Customs denied drawback and the United States Customs Court overruled appellant's protest against said denial on the part of the collector. From the judgment of the trial court, appellant has here appealed.

The pertinent provisions of said section 313, Tariff Act of 1930, follow:

SEC. 313. DRAWBACK AND REFUNDS.

(a) ARTICLES MADE FROM IMPORTED MERCHANDISE.—Upon the exportation of articles manufactured or produced in the United States with the use of imported merchandise, the full amount of the duties paid upon the merchandise so used shall be refunded as drawback, less 1 per centum of such duties  *  *  *.

It appears from the record that it was discovered by appellant that there was a more ready sale for the imported woolens in England than in the United States and that before exporting them to England, the so-called "Imperial process" of shrinking the goods was applied by Theodore Tiedemann Corporation, an American concern. The said Tiedemann Corporation was engaged in the business of shrinking woolens, most of its business being in shrinking woolens for use in the United States and a very small portion of its business being in shrinking woolens which had been imported but which were to be afterwards exported.

The process applied is briefly described by one · of appellant's witnesses as follows:

The woolens were placed between a leader cloth on a copper cylinder, or brass cylinder, perforated. It is then rolled between the leader; that is, it is rolled between the leader. There is a certain amount of blanket leader cloth placed on top of the woolen material. Then steam is let into the cylinder, and that steam is left on until it penetrates through the woolen merchandise and the leader cloth This steam is shut off when it penetrates through, and it is left there to cool; and then the material is taken out of the blanket and put on cardboards in 56-inch widths. It is all checked back. Before that is done it is checked with the orders we get, whether it is a converting order—just what it is. If there are any mistakes they are rectified before it is put through; that is, mistakes in yardage, of which there were several on these; and that was changed before it went through.

The record shows that this process did not shrink the goods to any great extent, although some shrinkage resulted; that the purpose of

the process was to render the goods shrink proof so that they would not shrink after having been made into garments; that it is necessary to shrink all woolen piece goods before being tailored and that the process employed by the Tiedemann Corporation was a well-recognized and effective means of shrinking woolen goods. The evidence furthermore shows that after the goods have been so treated they feel firmer and more "leathery."

It is also shown in the record that this identical merchandise had been shrunk before being exported from London; that when exported it was not offered for sale as "Imperial finished" piece goods; that the foreign consignee did not know what the process of "Imperial finishing" consisted of and did not order or even suggest that it be applied to the goods. The goods lost very little yardage by the "Imperial finishing" in this country and the cause, at least in part, of this result would seem obvious—they had already been shrunk.

It is a matter of common knowledge that woolen piece goods by the application of water may be and often are shrunk by the tailor before the cloth is cut and that the shrinking of the goods brings the fibers closer together and necessarily results in making the goods feel somewhat different than before the shrinkage.

It is argued by appellant that since shrinkage of the goods is a necessary and indispensable process and one which must be regarded as a manufacturing effort, a new article was manufactured or produced from the imported merchandise within the meaning of section 313 (a), *supra*.

In oral argument it was pointed out by appellant that whether or not the alleged manufacturing process was applied with a view of obtaining drawback is unimportant in view of the decisions of this court. That, of course, is true, if the exported article was in fact manufactured or produced in the United States with the use of the imported merchandise.

In overruling appellant's protest the trial court, in part, said:

We find that the woolens in question were not manufactured or produced in the United States with the use of imported merchandise, but were simply imported woolens that had been subjected to additional processes without altering their name or character. This view is amply sustained in the celebrated case of *Ishimitsu* v. *United States*, 7 Ct. Cust. Appls. 186, T. D. 38963, wherein it was said among other things, referring to the case of *Hartranft* v. *Wiegmann*, 121 U. S. 609:

It was also in substance and by way of illustration said that washing and scouring wool or cleaning and ginning cotton did not result in a manufacture of wool in the one case and of cotton in the other.

We are in agreement with the conclusion reached by the trial court. Our decision in *Rolland Frères, Inc.* v. *United States*, 23 C. C. P. A. (Customs) 81, T. D. 47763, would seem to be controlling of the decision in the instant case. In that case a portion of a stock of imported dresses which was not sold in this country was embroidered.

The embroidery was in colors to match the dresses and was placed on the fronts and necks—sometimes on the entire front of the dress and also around the neck, and in some instances on the sleeves. Following our decision in the case of *United States* v. *Adolphe Schwob, Inc.*, 21 C. C. P. A. (Customs) 116, T. D. 46447, which involved drawback claimed in connection with watches which were claimed to be manufactured or produced in this country with the use of imported watch cases, we held that it was immaterial whether the manufacturing effort had or had not been expended on the articles to make them respond to the drawback provision and thereby enable the obtaining of drawback. We also held that Congress, by the addition of the word "produced" after previously having used the term "manufactured," broadened the provision. We, however, held, largely in view of the Supreme Court's decision in *Anheuser-Busch Association* v. *United States*, 207 U. S. 556, involving cleaned, steamed and coated corks, that the exported dresses had neither been manufactured nor produced in the United States with the use of imported merchandise; that there had been no such "transformation" of the imported article as the statute contemplated, and that no new and different article emerged "having a distinctive name, character or use." We stated that the dresses were still dresses as the corks were still corks in the *Anheuser-Busch* case, *supra*.

Obviously, if there was no such transformation of the dresses in the *Rolland Frères, Inc.*, case, *supra*, there was no such transformation in the case at bar. Woolen cloth was imported; the same woolen cloth without material change was exported. In this instance, whether the process performed in the so-called shrinkage operation amounted to a manufacturing effort or not is not of controlling importance. A thing may be manufactured in one tariff sense and not manufactured in another tariff sense. It was not the intent of Congress to permit drawback even though the goods might, in one sense, be said to have gone through a manufacturing process in this country if there was no greater transformation or change in the article than is shown here.

We do not think the facts of this case bring importer's merchandise upon which it seeks drawback within the letter of the statute. Certainly they do not bring it within the spirit of the same. On this phase of the case we think the case of *United States* v. *American Railway Express Co.*, 11 Ct. Cust. Appls. 505, T. D. 39659, sheds some light, although it involved the construction and application of a statute aimed at a purpose quite different from that at bar.

In view of the fact that we are of the opinion that the issue in this case is not a close one we deem it unnecessary to cite and discuss cases other than those which we have cited *supra*.

The judgment of the United States Customs Court is *affirmed*.

GARRETT, Judge, concurs in the conclusion.